# In the United States Court of Federal Claims

No. 24-1187
Filed: February 7, 2025
Published: March 6, 2025†

| |
|---|
| **THALES USA, INC.,** |
| *Plaintiff,* |
| v. |
| **THE UNITED STATES,** |
| *Defendant,* |
| and |
| **INDRA AIR TRAFFIC, INC.,** |
| *Intervenor-Defendant.* |

*Jessica C. Abrahams*, with *Lora A. Brzezynski, Dana B. Pashkoff, Brianna L. Silverstein, Michelle Y. Francois*, Faegre Drinker Biddle & Reath LLP, Washington, D.C., for Plaintiff.

*Alexander S. Brewer*, Trial Attorney, with *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, *Albert S. Iarossi*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., with *Josephine R. Farinelli*, Of Counsel, Trial Attorney, U.S. Department of the Air Force, for Defendant.

*Sharon L. Larkin*, with *James M. Larkin*, The Larkin Law Group LLP, Annapolis, MD, for Intervenor-Defendant.

---

† This Opinion was originally filed under seal on February 7, 2025, (ECF No. 50). The Court provided parties the opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions. The parties disagree regarding the extent of redactions appropriate for this public decision. (*See generally* ECF No. 52). The Court addressed these disagreements in an Order issued on March 6, 2025. (ECF No. 53). The sealed and public versions of this Opinion differ only to the extent of those redactions, the publication date, and this footnote.

**MEMORANDUM OPINION AND ORDER**

**TAPP, Judge.**

This post award bid protest considers whether the Department of the Air Force ("the Air Force") erred when it awarded Indra Air Traffic, Inc. ("Indra"), a firm fixed-price contract for a portable air navigation system. Disappointed offeror, Thales USA, Inc. ("Thales"), alleges the Air Force: (1) improperly evaluated the offerors' proposals and treated the offerors unequally; (2) used a flawed price evaluation and conducted unequal discussions; (3) conducted an improper best value tradeoff; and (4) issued an improper source selection decision. For reasons set forth below, the Court **DENIES** Thales's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 34), and **GRANTS** the United States' and Indra's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No 37; Int-Def.'s xMJAR, ECF No. 36).

**I.   Background**

This procurement involves a firm fixed-price contract to replace the Air Force's legacy tactical air navigation systems ("AN/TRN-41") with a new man-portable tactical air navigational aid system known as the MP TACAN.[1] (Administrative Record ("AR") at 1219). Essentially, the system provides a signal that aircraft can use to help navigate. (AR 1219). The Solicitation contemplated a five-year Indefinite Delivery/Indefinite Quantity ("ID/IQ") contract with an option to extend the ordering period for two years. (AR 282). The maximum amount for the ID/IQ was set at $198,360,000 million. (*Id.*).

The Solicitation stated that the award would go to an offeror deemed responsible and whose proposal conformed with the Solicitation's requirements and represented the best value. (AR 517). The evaluation factors consisted of: (1) Technical, (2) Technical Risk, and (3) Price. (AR 518). The Solicitation provided that "[a] proposal must be found technically acceptable under Factor 1 Evaluation Criteria in order to be considered for best value tradeoff between Technical Risk and Price factors." (AR 519). The Solicitation also stated that only technically acceptable offers would undergo "the best value analysis and potential trade off between Technical Risk and Price factors." (*Id.*). Further, Factor 2 (Technical Risk) and Factor 3 (Price) were weighted approximately equally. (*Id.*).

Factor 1 (Technical) evaluated the offeror's approach for meeting the technical requirements of six subfactors: (1) System Requirements Document's ("SRD") Cross-Reference; (2) SRD Requirements; (3) SRD Non-Compliance (Performance Gap); (4) Small Business Participation; (5) Delivery Requirements; (6) CDRL Data Rights. (AR 519–21). The Air Force assigned an Acceptable or Unacceptable rating. (*Id.*) Proposals rated as Unacceptable for any

---

[1] Solicitation No. FA8102-23-R-2000. Existing TACANs have exceeded their useful life. (Oral Argument ("OA") Tr. 18:21–24 (affirming original TACANS were procured in 1978 and have a 40-year lifespan), ECF No. 49).

subfactor received an overall Unacceptable Technical rating and were ineligible for award. (AR 519). Not all of these subfactors are at issue here.

Subfactor 1, SRD Cross-Reference, required offerors to complete a matrix indicating compliance or non-compliance with minimum threshold requirements. (AR 1225). Offerors were only permitted to indicate compliance if their MP TACAN met the threshold requirements, as of the date of the proposal, without additional testing or modification. (*Id.*). Offerors were to note non-compliance if "the current proposed product specifications for the MP TACAN require[d] additional testing or modifications to meet the minimum threshold[,]" indicating a "Performance Gap." (AR 1226). Any requirements identified as non-compliant had to be addressed in Subfactor 3 "unless it [was] addressed in Subfactor [2]." (AR 1226). This subfactor minimum was met when the matrix was completed. (AR 519).

Subfactor 2, SRD Requirements, required offerors to document how the proposed MP TACAN replacement met Subfactors 2a–2f or would meet those subfactors by delivery. (AR 507–08).[2] The Air Force deemed offerors to have met the requirements of Subfactor 2 if their "proposal indicate[d] an adequate understanding of the requirements and provide[d] documentation/convincing rationale on how their approach meets or will meet" Subfactors 2a–2f. (AR 519–20).

Subfactor 3, SRD Non-Compliance (Performance Gap), required offerors to propose an approach for "overcoming/meeting each performance gap identified in Subfactor 1 to fully meet the threshold requirements listed in the SRD to the fullest extent possible." (AR 520). This subfactor minimum was met when the offeror's proposal indicated an "adequate understanding of the requirements and provides documentation or convincing rationale on how their approach will meet, or meet to the fullest extent possible, the requirements for each identified performance gap." (*Id.*).

Subfactor 5, Delivery Requirements, required offerors to provide a schedule and approach to ensure delivery of the first five units within fourteen months of the award. (AR 1183–84). Additionally, Subfactor 5 required the offeror to provide subsequent orders to be delivered at a rate of five units per month. (AR 1227).

Subfactor 6, CDRL Data Rights, required offerors to provide another completed matrix indicating the asserted/proposed data rights, while considering the data rights requested by the United States. (AR 1227). If offerors proposed anything less than what was requested, the offeror was required to explain "how their Intellectual Property assertions will impact fielded system's organic sustainment and repairs." (*Id.*; AR 521).

Factor 2 (Technical Risk) evaluated the offerors ability to address "risk associated with the approach provided" for Subfactors 2, 3, 5, and 6 of Factor 1. (AR 1228). The Solicitation

---

[2] The subfactors for Subfactor 2 were as follows: 2a: Flight Check (SRD QLT-2, KPP), 2b: Portability (SRD PER-1, KPP), 2c: Set Up (SRD PER-2), 2d: Transmitter Power Out (SRD QLT-5), 2e: Remote Monitoring & Maintenance (RMM) (SRD RMM-2). 2f: Mean-Time-Between Failure (MTBF) (SRD QLT-17). (AR 507–08).

required offerors to provide a rationale "[f]or each identified risk . . . and quantitative estimates for both potential consequence and the probability of the risk to occur." (AR 1228). Additionally, offerors had to provide mitigation approaches detailing how it would reduce or eliminate each risk. (*Id.*). The Air Force would evaluate the degree to which the offeror's technical approach may disrupt the schedule, increase cost, degrade performance, increase the need for oversight, or increase the likelihood of unsuccessful performance. (*Id.*).

Factor 3 (Price) evaluated price proposals for "(1) price reasonableness (including completeness), (2) balance, (3) price realism, and (4) Total Evaluated Price ("TEP")." (AR 522). Incomplete, unreasonable, or unrealistic prices would not be considered for award. (*Id.*). Additionally, an offeror's price might be rejected if it contained unbalanced pricing "to the extent it poses an unacceptable risk to the Government." (*Id.*).

The Air Force received two proposals, one from Thales, and the other from Selex ("Indra").[3] (AR 2752). For Factor 1 (Technical), Indra received ████████ while Thales received ████████ (AR 2755–56, 2759–60). For Factor 2 (Technical Risk), Indra was rated "████" while Thales was rated "████" (AR 2756, 2761). Indra's initial TEP was ████ and Thales TEP was $████. (AR 2757, 2791). To address concerns within the proposals, the Air Force conducted discussions with both offerors through evaluation notices ("ENs") affording each offeror an opportunity to enhance or revise their proposals. (AR 2945–7651). Prior to submitting their final proposal revisions ("FPR"), Thales and Indra were permitted to submit a draft final proposal revision ("DPFR") for which the Air Force provided feedback regarding outstanding deficiencies. (AR 10558–83).

Upon receipt of the FPRs, the source selection evaluation board ("SSEB") evaluated each offeror's proposal and issued a final evaluation report, summarized in the following chart:

| Offeror | Factor 1—Technical | Factor 2—Technical Risk | Factor 3—Price |
|---|---|---|---|
| INDRA | Subfactor One: Acceptable<br>Subfactor Two: Acceptable<br>Subfactor Three: Acceptable<br>Subfactor Four: Acceptable<br>Subfactor Five: Acceptable<br>Subfactor Six: Acceptable<br>Overall: Acceptable | LOW<br>Significant Weaknesses: 0<br>Weaknesses in Approach: 0 | $75,186,022.49 |
| THALES | Subfactor One: Acceptable<br>Subfactor Two: Acceptable<br>Subfactor Three: Acceptable<br>Subfactor Four: Acceptable | LOW<br>Significant Weaknesses: 0<br>Weaknesses in Approach: 2 | ████ |

---

[3] Selex's air navigation business was acquired by Indra in 2023. (Pl.'s MJAR at 6, ECF No. 34; Def.'s xMJAR at 2, ECF No 37). Therefore, Selex and Indra are used interchangeably throughout this Opinion.

|  | Subfactor Five: Acceptable Subfactor Six: Acceptable Overall: Acceptable |  |  |

(AR 13442–48). The source selection advisory council ("SSAC") reviewed the SSEB's findings and concurred with its evaluations. (AR 13449–50). Specifically, the SSAC found the proposals of both Indra and Thales to be Acceptable for Factor 1 (Technical) and therefore "eligible for award for trade-off consideration between Factor 2 Technical Risk and Factor 3 Price." (AR 13459).

The SSAC also determined Indra's proposal to be superior for Factor 2 (Technical Risk) because Indra received no weaknesses while Thales received two weaknesses in its Factor 2 evaluations for Subfactors 3 (SRD Requirements Performance Gap for SRD elements) and 6 (CDRL Data Rights). (AR 13460–61). For Subfactor 3, Thales's approach provided a schedule that indicated ███████████ of its product would not be completed until ███████████████████████████. (AR 13460). While the SSAC did not find failure likely, it determined that failing one or more of the environmental tests remained a possibility and therefore a risk. (Id.). The SSAC considered the potential impact such a failure could have, stating "the system could not operate in certain harsh environments," and concluded that aircraft might be unable to navigate safely. (Id.). Though the SSAC determined Thales's approach to be acceptable, it determined "the residual risk" pertaining to possible test failures constituted a weakness. (Id.). For Subfactor 6, Thales's approach offered only limited data rights to the Air Force. (AR 13461). If the Air Force elected to obtain increased data rights, the SSAC found a risk that, should it choose to exercise this option, the Airforce may not be able to obtain increased data rights until ████████████████████████████ which "would delay a fully functional organic depot capability and would increase the cost[.]" (AR 13460–61).

For Factor 3 (Price), Indra had the lowest price with a TEP of $75,186,022.49 while Thales TEP was ████████████. (Id.). The SSAC determined there were "no tradeoff considerations for Technical Risk to justify awarding to a higher priced Offeror." (Id.). Finally, the source selection authority ("SSA") would review all relevant documentation, including the determinations of both the SSEB and the SSAC, and ultimately concluded that Indra's proposal offered the best value for the Air Force's requirements. (AR 13463–75). Accordingly, the SSA directed the award be made to Indra. Thales now protests that award.

## II.   Analysis

When deciding a bid protest, the Court "appl[ies] the appropriate [Administrative Procedure Act ("APA")] standard of review, 5 U.S.C. § 706, to the Air Force decision based on the record the Air Force presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Under the APA, the Court determines whether the Air Force's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." *Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 907 (Fed. Cir. 2013). In other words, the Court must determine whether: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure

involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009).

In determining whether the Air Force's decision was arbitrary or capricious, the Court asks whether the action was "legally permissible, reasonable, and supported by the facts." *UnitedHealth Mil. & Veterans Servs., LLC v. United States*, 132 Fed. Cl. 529, 551 (2017). The Court may not substitute its own judgment for that of the Air Force. *Id.* Rather, "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government" particularly in the "minutiae of the procurement process[.]" *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). This standard is "highly deferential." *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008). Further still, a "protestor's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a "best-value" procurement." *Banknote Corp. of Am., Inc. v. United States*, 56 Fed. Cl. 377, 380 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004). If the Air Force's decision fails under this standard, the Court determines whether the "bid protester was prejudiced by that conduct." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). The protestor must demonstrate prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for the [Air Force's] errors." *Id.* at 1353.

When parties move for judgment on the administrative record, RCFC 52.1 provides a procedure to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Id.* at 1356. Genuine issues of material fact do not preclude judgment on the administrative record, so the Court can resolve questions of fact by referencing the administrative record. *Id.* at 1355–56. Because the Court is bound to the administrative record, it "will not put words in an agency's mouth or invent supporting rationales the agency has not itself articulated." *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 764 (2022) (quoting *IAP Worldwide Servs. v. United States*, 159 Fed. Cl. 265, 286 (2022)). It follows that the Court is suspect of "any rationale that departs from the rationale provided at the time the procuring agency made its decision." *Sys. Stud. & Simulation, Inc. v. United States*, 152 Fed. Cl. 20, 32 (2020) (quoting *Raytheon Co. v. United States*, 121 Fed. Cl. 135, 158 (2015), *aff'd* 809 F.3d 590 (Fed. Cir. 2015)).

Thales challenges the Air Force's award to Indra as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. (*See generally* Pl.'s MJAR). First, Thales argues the Air Force failed to conduct proper evaluations under Factor 1 (Technical) and Factor 2 (Technical Risk). (*Id.* at 20–24). Specifically, Thales claims the Air Force failed to appreciate Indra's insufficient ▮▮▮▮▮▮▮▮▮ of its proposed MP TACAN and that the Air Force improperly assigned Thales two weaknesses. (*Id.* at 24). Thales also argues the Air Force's price evaluation was arbitrary and capricious because it "failed to follow the Solicitation's requirement to assess offerors' understanding of the requirements or any inherent performance risk in offerors' proposals." (*Id.* at 31). Specifically, Thales asserts that the Air Force's price realism analysis was unsupported and irrational, and that the Air Force conducted unequal discussions with Thales and Indra resulting in a large price disparity between the offerors. (*Id.* at 31–34). Thales next argues the Air Force's best value analysis was flawed due to improper evaluation of technical, technical risk, and price. (*Id.* at 36–37). Lastly, Thales argues the source selection decision was arbitrary and capricious because the SSA failed to exercise independent judgment

6

when conducting a comparative assessment of the proposals and in making its best value determination. (*Id.* at 37–39). Based on these errors, Thales claims it is entitled to injunctive relief. (*Id.* at 39–40). The Court respectfully disagrees.

      A.      *The Air Force's Evaluations*

Thales alleges the Air Force failed to properly evaluate Indra's and Thales's proposals under Factor 1 (Technical) and Factor 2 (Technical Risk). Additionally, Thales claims that it was treated unequally.

      1.      <u>The Air Force correctly applied the Solicitation's evaluation criteria in evaluating Indra's Factor 1 proposal.</u>

Thales alleges the Air Force failed to properly execute its technical evaluation of Indra by ignoring "glaring red flags [that] should have resulted in technical weaknesses[.]" (Pl.'s MJAR at 18–19). Thales based these allegations on two factors: (1) the Air Force knew that Indra had never deployed an MP TACAN system; and (2) Indra admitted that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (*Id.*).

Thales's first basis focuses on Indra's lack of experience or past performance with MP TACANs. Under the Federal Acquisition Regulations ("FAR") "[p]ast performance need not be evaluated if the contracting officer documents the reason past performance is not an appropriate evaluation factor for the acquisition." FAR 15.304(c)(3)(iii). In this case, the Air Force drafted a Determination and Findings ("D&F") explaining why it determined that past performance evaluations were inappropriate for this procurement. (AR 18070–72). In its D&F, the Air Force explained that based on market research Thales and Indra were the only suppliers capable of meeting the Air Force's requirements and that both had experience developing navigational aids for the Department of Defense and its military partners. (AR 18071). The Air Force ultimately concluded that both Thales and Indra were competent parties capable of fulfilling the Solicitation. (AR 18072). Based on these findings, the Air Force determined that past performance was not a "discriminating or appropriate evaluation factor for this acquisition." (*Id.*). In assessing whether a prospective enterprise has sufficient experience to meet the needs of a particular procurement, neither the Court nor a disappointed bidder, are best suited to evaluate the relative capability of an awardee.

Additionally, past performance or experience "was not a stated evaluation criterion, or reasonably encompassed within the stated criteria." (Def.'s xMJAR at 18 (citing AR 18070–72)). From the plain language of the Solicitation, it is clear that past performance would not be incorporated into the analysis under any of the factors of this Solicitation. (AR 519–25). This information was readily apparent to bidders; yet there were no objections. "[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in" our Court. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). Thus, whether there was any merit to Thales's claim regarding the Air Force's measure of the bidder's past performance, that objection is waived.

Thales's argument that Indra should have received a technical weakness under Factor 1 (Technical) is also unsupported. When reading the Solicitations rating scheme for Factor 1, it states that:

> Each subfactor within the technical factor will receive one of the ratings described below based on the criteria listed below. Individual subfactor ratings will be used to determine the overall technical acceptability of each offeror. To be determined technically acceptable at the factor level, the offeror must be rated acceptable in each subfactor. A single deficiency (IAW FAR 15.001) within a subfactor will result in an unacceptable rating for that subfactor.

| Adjectival Rating | Description |
| --- | --- |
| Acceptable | Proposal meets the requirements of the solicitation |
| Unacceptable | Proposal does not meet the requirements of the solicitation |

(AR 519). From the plain language of the Solicitation, offerors could anticipate receiving one of these two possible ratings under Factor 1 and its corresponding subfactors: Acceptable or Unacceptable. (*Id.*).

This language is markedly different from the possible ratings offerors could receive under Factor 2 (Technical Risk), expressly stating that "[t]he Government will review and analyze the offeror's approach and apply professional judgment in determining whether the approach includes *weaknesses(es)*, *significant weakness(es)*, and/or deficiencies in relation to Subfactors 2, 3, 5, and 6." (*Id.* at 521 (emphasis added)). The Solicitation did not contemplate assigning weaknesses under Factor 1 but instead, ratings were to be made on an Acceptable or Unacceptable basis. (AR 519) Therefore, Thales's suggestion that the Air Force should have assigned Indra a technical weakness under Factor 1 is contrary to the Solicitation's stated terms.

Thales further asserts that "Indra's admission that there was a risk ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ contradicted its indication of environmental compliance on the SRD Matrix of Subfactor 1, Technical. (Pl.'s MJAR at 22; *see also* AR 1307). Again, that SRD Matrix only required offerors to indicate compliance or non-compliance with the minimum threshold requirements outlined in Section 2 of the SRD. (AR 1225). The Solicitation states that the minimum requirements of Subfactor 1, Technical were met "when the offeror's proposal demonstrates the matrix *is completely filled-in clearly indicating compliance and non-compliance* for the proposed solution." (AR 519 (emphasis added)). Nothing more was required. The Solicitation only required the Government to evaluate the offeror's responses under Subfactor 1, Technical for completion. (*See* AR 519, 1225–26). Indra was only required to complete the SRD Matrix in full, and it did so. (*Id.*). The Air Force followed the Solicitation and determined that Indra fully completed the SRD Matrix, thus it properly evaluated Indra's proposal under Subfactor 1, Technical. To the extent Thales raises issues with the solicitation's terms, this is a patent defect, thus its challenge is untimely.

  2. <u>The Air Force correctly applied the Solicitation's evaluation criteria in evaluating Indra's Factor 2 –Technical Risk proposal.</u>

  Next, Thales argues that the Air Force improperly evaluated Indra's proposal under Factor 2 (Technical Risk). (Pl.'s MJAR at 20–24). Primarily, Thales asserts the Air Force failed to question Indra regarding its self-identified risk about ▮▮▮▮▮▮ and failed to follow up on the state of Indra's development (*Id.* at 23). The Court is not persuaded.

  For Factor 2 (Technical Risk), the Solicitation provided that evaluation would assess the degree to which the offeror's technical approach may cause "disruption of schedule, degradation of performance, the need for increased Government oversight, or increased likelihood of unsuccessful contract performance." (AR 521). Under these instructions, offerors were to address technical risks associated with their approach under Factor 1 in connection with Subfactors 2, 3, 5, and 6. (AR 1228). Offerors were meant to provide a rationale for the risk and quantitative estimates for both potential consequences and probability of the risk to occur. (*Id.*). Notably, Subfactors 1 and 4 were not to be evaluated for Technical Risk. (AR 512). In completing their risk assessment, offerors were to also outline mitigation approaches to eliminate or reduce each risk. (AR 1228).

  Taking into consideration the offeror's self-identified risks and mitigations, the Air Force conducted its own independent risk assessment evaluating whether there were any risks not identified by the Offeror. (AR 521). The Air Force would also apply its own judgment in deciding whether the approach included "weakness(es), significant weakness(es), and/or deficiencies in relation to Subfactors 2, 3, 5, and 6." (AR 521). The Air Force utilized the Offeror's data, information, and approach from their Factor 1 (Technical) proposal, and could assign one of the following overall technical risk ratings:

| Adjectival Rating | Description |
|---|---|
| Low | Proposal may contain weakness/weaknesses which have low potential to cause disruption of schedule, increased cost, or degradation of performance. Normal contractor emphasis and normal Government monitoring will likely be able to overcome any difficulties. |
| Moderate | Proposal contains a significant weakness or combination of weaknesses which may have a moderate potential to cause disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will likely be able to overcome any difficulties. |
| High | Proposal contains a significant weakness or combination of weaknesses which is likely to have high potential to cause significant disruption of schedule, increased cost, or degradation of performance. Special contractor emphasis and close Government monitoring will unlikely be able to overcome any difficulties. |
| Unacceptable | Proposal contains a deficiency or a combination of significant weaknesses that causes an unacceptable level of risk of unsuccessful performance. |

(521). Award eligibility hinged on an Offeror's Low or Moderate rating. (*Id.*).

  In its Factor 2 (Technical Risk) proposal, Indra self-identified a "low probability" risk assessment associated with Portability ("PER-1"), which is summarized in the chart below:

**Table 2.1-1 Selex Identified Risk and Mitigation to Portability.**



(AR 1307). Subfactor 2 of Factor 1 required offerors to show how its proposed TACAN "meets, or will meet by delivery of the first system" certain critical elements, one of which was Portability. (AR 1226). For PER-1, the Solicitation stated that "[t]he [Offeror's] approach must ensure the requirements of SRD PER-1, KPP are met for a 2-person lift (with or without transport aide) during man-carry activities." (AR 520). To comply with PER-1, offerors were required to "describe their product's physical dimensions, weight, and manpower requirements[.]" (AR 1226).

Thales argues that Indra's self-identified risk of ▮▮▮▮▮▮ and the "state of Indra's development" both have a "critical impact on the SRD Matrix." (Pl.'s MJAR at 23). As previously stated, the SRD Matrix was provided under Subfactor 1, Technical which was *not* to be evaluated for Technical Risk. (AR 521). The Air Force had no obligation to assess risks as they pertained to the SRD Matrix.

Thales alleges the Air Force was aware of the "nascent state" of Indra's product development and argues Indra should have received a significant risk rating. (Pl.'s MJAR at 23). Thales concerns itself with Indra's ability to meet delivery requirements under the contract, but as the United States has pointed out, Indra's ability to meet the requirements of this Solicitation was extensively discussed within the Air Force's responsibility determination. (AR 9799–807). In determining whether Indra could meet the delivery requirements, the Contracting Officer ("CO") found that "[Indra] provides evidence to show that the Offeror can meet the requirement of five (5) units on the first delivery order and meet the requirement of five (5) units per month delivery starting no later than 12 months after the delivery order is executed." (AR 9800). The CO also reviewed Indra's past performance:

> Selex has demonstrated a proven record of acceptable performance on same/similar requirements that have been recently completed. Additionally, Selex has a previous record of Satisfactorily support Government requirement on different PSCs as noted above. There is no noted instance of

> unsatisfactory rating. The Government expects the same level of performance from Indra since it's the same people, in the same facilities, with the same subcontractors, using the same manufacturing processes. and intellectual property to complete the requirement.

(AR 9802). The Air Force rationally concluded that Indra could meet the Solicitation's requirements.

Thales argues that the Air Force should have assigned Indra a "significant risk" based on Indra's admission that its product ███████████████████████████████████████. (Pl.'s MJAR at 23–24). Thales also asserts that the Air Force failed to question Indra regarding this admission, nor did it question Indra's mitigation plan for the identified risk. (*Id.*). Under the Solicitations terms, the Air Force evaluated the offeror's risk assessments to identify any risk not raised by the offeror. (AR 521). The Air Force issued two ENs to Indra under Subfactor 2, highlighting unaddressed risks within Indra's risk assessment and indicating the Air Force's independent assessment of risk. (AR 10620–30). There is no requirement that the Air Force provide a detailed analysis for every decision it makes, and Indra's identification of risk certainly did not mandate assigning a weakness. *See Scott Tech. v. United States*, 168 Fed. Cl. 705, 717 (2023) (finding that the plaintiff confused a broad documentation requirement with a requirement to individually address each risk and mitigation strategy). The Air Force did not question Indra regarding the ███████ issue, most likely because it found Indra's mitigation plan to be sufficient. Thales fails to demonstrate any error in the Air Force's evaluation.

### 3. The Air Force treated the offerors equally.

Thales alleges that the Air Force conducted unequal evaluations by holding "Thales to a higher standard than Indra in assessing Thales with weaknesses under Subfactor 3–SRD Performance Gap and Subfactor 6–Data Rights," and applying unstated evaluation criteria when evaluating Thales's proposal. (Pl.'s MJAR at 25). The Federal Circuit has explained that to prevail on a claim of unequal treatment, the protester must show "that the agency unreasonably downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly identical [to] those contained in other proposals[,]" *Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (internal citations omitted), or that "the agency inconsistently applied objective solicitation requirements between it and other offerors, such as proposal page limits, formatting requirements, or submission deadlines," *id.* (citing *Sci. Applications Int'l Corp. v. United States*, 108 Fed. Cl. 235, 272 (2012)). Only when a protester meets one of these thresholds may the reviewing court "comparatively and appropriately analyze the agency's treatment of proposals without interfering with the agency's broad discretion in these matters." *Vectrus Sys. Corp. v. United States*, 154 Fed. Cl. 29, 42 (2021) (quoting *Office Design Grp.*, 951 F.3d at 1373).

Unless two (or more) proposals are substantively indistinguishable, the Court should abstain from second-guessing "the agency's discretionary determinations underlying its technical ratings," because "[t]his is not the [C]ourt's role." *Office Design Grp.*, 951 F.3d at 1373 (citing *E.W. Bliss Co.*, 77 F.3d at 449). Stated differently, if a protestor fails to show that the proposals in question are indistinguishable for purposes of the evaluation, then the exercise involves the second-guessing of minutiae which the Court will not do because it involves discretionary

11

determinations. *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017)) (quoting *E.W. Bliss Co.*, 77 F.3d at 449). Rather, "[s]uch subjective judgments will only be disturbed when inconsistencies are demonstrated." *USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 462 (2010).

For Subfactor 3 – SRD Performance Gap, Thales alleges that the Air Force scrutinized Thales's responses to EN's more stringently than Indra's responses. (Pl.'s MJAR 26–29). To support this argument, Thales asserts that the Air Force assessed a weakness for ▮▮▮▮ ▮▮▮▮ concerns despite having "[a] detailed plan for compliance[;]" however, Indra was not assessed any weaknesses for concerns identified by the Air Force, despite providing mitigation plans that were unsupported by evidence. (*Id.* at 26–27). Thales also complains that the Air Force identified a risk that Indra may not be able to comply with the Solicitation's delivery schedule which could create supply chain issues. (Pl.'s MJAR at 27). Specifically, Thales argues the Air Force "blindly accepted [Indra's] responses and determined that they resolved any weaknesses, despite their conclusory nature." (*Id.*). Not so.

Thales received two separate ENs; the first was provided in connection with Factor 1 (Technical) while the second concerned Factor 2 (Technical Risk). (AR 10639, 10674). In completing its Subfactor 1 SRD Matrix, Thales self-identified that its MP TACAN was non-compliant with several ▮▮▮▮▮▮▮▮▮▮ requirements. (AR 12393–95). An indication of non-compliance required Thales to address its self-identified non-compliances under Subfactor 3 – SRD Non-Compliance (Performance Gap). (AR 1227). The description of the Air Force's EN for Factor 1 (Technical) was that the "[o]ffeor's proposal does not meet the requirements for Subfactor 3, (Performance Gap)." (AR 10639).

The description of the Air Force's EN for Factor 2 (Technical Risk) was that "[t]he Government has identified a weakness in the Offeror's approach related to Subfactor 3, SRD Non-Compliance (Performance Gap), Specific Environmental Requirements." (AR 10674). Specifically, the Air Force requested Thales provide its "approach describing how additional testing will be accomplished for the [environmental] requirements . . . [and] address any mitigations to assure the [environmental] requirements are met to the fullest extent possible." (AR 10675).

In contrast, Indra's Subfactor 1 SRD Matrix indicated that its system met threshold requirements, whereas Thales's SRD Matrix indicated that its proposal did not meet environmental threshold requirements. (*Compare* AR 11434–35, *and* 11442, *with* AR 12393–95). Because Thales identified its product as non-compliant, the terms of the Request for Proposals ("RFP") required Thales to provide an approach to ensure its product would meet the minimum threshold requirements. (AR 1227). Indra did not indicate non-compliance for PER-1 or environmental concerns and therefore it was not required to provide additional information. (AR 11434–35, 11442). Nonetheless, the Air Force did issue an EN to Indra regarding the portability of its product. (AR 10586–88). The EN was provided in connection with Factor 1 (Technical) and the description stated that Indra's approach "does not meet the requirements for Subfactor 2b Portability." (AR 10586).

Substantively, Thales's self-identified failure to complete ▮▮▮▮▮▮▮▮▮▮ is readily distinguishable from Indra's self-identified risk under PER-1. *Office Design Grp.*, 951 F.3d at

1372. Further still, Thales's arguments that the Air Force "treated Indra differently" when evaluating the risks associated with Indra's delivery and supply chain are substantively different from Thales's ▓▓▓▓▓▓▓▓▓▓ requirements. (*See* Pl.'s MJAR at 27). Thales fails to demonstrate that its proposal put forth "nearly identical" terms to Indra's and the Air Force conducted unequal evaluations for offers that were "substantively indistinguishable[.]" *Office Design Grp.*, 951 F.3d at 1372. Instead, Thales asks this Court to second-guess the Air Force's evaluations, which is an exercise that is unsupported by law and undermines Air Force discretion. *See id.*

The AR establishes that the Air Force carefully reviewed each proposal, and the differences Thales complains about are "not the result of disparate treatment of 'indistinguishable' proposals." *Blue Water Thinking, LLC v. United States*, 159 Fed. Cl. 65, 78 (2022) (internal citations omitted). Simply because a disappointed bidder disagrees with the Air Force's evaluation does not entitle the Court to "substitute its judgment for that of the Air Force when the Air Force has clearly articulated a rational connection between facts and conclusions about distinguishable proposals." *Id.* (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). This basic tenet of protest jurisprudence is, like here, frequently unheeded. Thales claims of unequal treatment fail.

For Subfactor 6 – Data Rights, Thales argues that both Indra and Thales failed to provide the Air Force unlimited data rights, but only Thales was improperly assigned a weakness for doing so. (Pl.'s MJAR at 29–30). This characterization is misleading. The Solicitation requested that offerors provide a CDRL Assertion Matrix indicating the proposed data rights while also considering the data rights requested by the Air Force. (AR 1227). If the offerors proposed "anything less than what the Government requested[,]" they were required to justify and describe how "their Intellectual Property assertions will impact fielded system's organic sustainment and repairs." (AR 1227).

In its CDRL Assertion Matrix, Thales proposed reduced data rights for thirteen of the forty-nine requested rights. (*See* AR 12401–03, 10682–83). In contrast, Indra's CDRL Assertion Matrix proposed to give all rights requested by the Air Force apart from a limitation on only one of the 49 rights. (AR 11984–85). Thales points to the fact that both Thales and Indra offered reduced rights for CDRL ▓▓▓▓▓▓▓▓ to show unequal treatment. (AR 11984, 12401). If CDRL ▓▓▓▓▓▓▓▓ was the only reduced right proposed by both offerors, and if the Air Force had somehow unequally evaluated them, then Thales might plausibly raise a valid basis for its claim. The Court, however, cannot ignore the fact that for twelve other CDRLs, Thales offered the Air Force rights that were less than what the Air Force requested. (AR 12384–90, 12401–03). In this respect, the proposals of Indra and Thales are distinguishable. Thales claims of unequal treatment under Subfactor 6 – Data Rights fail.

Lastly, Thales claims the Air Force forced Thales to comply with requirements that were "inconsistent with the Solicitation, unrealistic, and not applied to Indra." (Pl.'s MJAR at 29). Thales makes this argument because the Air Force asked Thales to "indicate whether testing [would] be completed before contract award[,]" despite the Solicitation's requirement that testing only be completed at the time of delivery. (*Id.* (citing AR 1227, 10678–79)). The problem here is that the Court cannot discern evidence of unequal treatment. As previously discussed, Indra indicated that its product was compliant with the environmental requirements. (AR 11434–35,

11442). Thales did not, which is why the Air Force posed follow-up questions to Thales. These proposals were substantively distinguishable. Again, the Court declines to question the minutiae of the Air Force's determinations. *See Enhanced Veterans Sols., Inc.*, 131 Fed. Cl. at 588 (internal citations omitted).[4]

        B.      *The Air Force's price evaluation was proper.*

The Solicitation provided that offeror's proposed prices would be evaluated for price realism. (AR 523). To be found realistic, "the proposed price must demonstrate an adequate understanding of the requirement and must ensure the price does not pose an unacceptable risk to performance." (*Id.*). Thales argues that the Air Force conducted an improper price evaluation and engaged in unequal discussion resulting in a price disparity. (Pl.'s MJAR at 31–36).

        1.      <u>Price Realism Analysis</u>

Thales alleges the Air Force conducted "no actual analysis" in reaching its price realism findings. (Pl.'s MJAR at 32). Thales specifically argues that: (1) there is no indication that the Air Force considered whether Indra could perform the contract requirements at the price offered; (2) there was no analysis as to whether Indra's prices were reasonable and realistic; and (3) the Air Force failed to seek more details from Indra regarding its low prices. (*Id.* at 32–33).

An agency generally has discretion to determine the appropriate process for evaluating proposals. *Fulcra Worldwide, LLC v. United States*, 97 Fed. Cl. 523, 538–39 (Fed. Cl. 2011); *see* FAR 15.305(a) ("An agency shall evaluate competitive proposals . . . solely on the factors and subfactors specified in the solicitation. Evaluations may be conducted using any rating method or combination of methods. . . ."). However, when the agency has specified an evaluation process within the Solicitation, it must comply with the stated methodology. *See Ala. Aircraft Indus. Inc. v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009); *Fulcra Worldwide*, 97 Fed. Cl. at 539 ("If an agency commits itself to a particular methodology in the solicitation, it must follow that methodology."). The role of the Court is "limited to determining whether the evaluation was reasonable [and] consistent with the stated evaluation criteria . . . ." *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 659 (2002), *aff'd* 56 Fed. Appx. 474 (Fed. Cir. 2003). The Court will not disturb an agency's adequately documented and rational methodology or application. *Active Network, LLC v. United States*, 130 Fed. Cl. 421, 427 (2017) (citing *Cohen Fin. Servs., Inc. v. United States*, 110 Fed. Cl. 267, 288 (2013)). Ultimately, the Court disagrees with Thales's claims.

---

[4] The Court highlights that the Air Force assigned a weakness because it was "uncertain all testing [would] successfully pass" on the environmental requirements. (AR 10679). Notably, the Air Force did not say it was assigning a weakness because testing would not be completed by contract award, as Thales suggests. (*See* AR 10678–81). Further, Thales's argument that the Solicitation only required testing to be completed at the time of delivery is undermined even further because Thales own responses to the EN informed the Air Force that it did not anticipate testing to be complete until after "█████████████████████████████" (AR 10680). This alone would be a valid basis to assign Thales a weakness.

Here, the RFP stated that it would conduct a price realism analysis utilizing "one or more of the price analysis techniques described in FAR 15.404-1(b)(2)." (AR 523). A price realism analysis considers whether an offeror's price is too low, such that it demonstrates a lack of understanding of the requirements or poses an unacceptable risk of poor performance. *KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 356 (2015). The RFP provided that the Air Force might also utilize "other evaluation techniques, as needed." (AR 523). The Air Force utilized three different techniques to evaluate prices including: (1) comparison to the IGE at both the TEP and CLIN levels; (2) analysis of other than certified cost or pricing data that the Offeror provided; and (3) adequate price competition. (AR 13320–21, 13348–49).[5] The Court will look at the Air Force's first stated method of comparing prices to the IGE.

"Comparison of proposed prices with [the IGE]" is one of several methods by which an agency can determine if an offeror's price is fair and reasonable. FAR 15.404-1(b)(2)(v). Under this evaluation method, the Air Force found that both Thales and Indra had proposed prices for certain CLINs that were more than 25% less than the IGE. (*See* AR 9906–07, 9938–39). Any variance that was more than 25% less than the IGE resulted in an EN being issued.[6] (AR 13320). The ENs requested that the offerors review the proposed pricing for the identified CLINs and either provide confirmation of the price, supported by an explanation of the basis or rationale, or revise pricing along with any further rationale. (AR 9907, 9939). Indra and Thales both took different approaches in response. Thales revised its pricing on the identified CLINs, (AR 9939–42), while Indra chose to confirm the prices it had already proposed, (AR 9908–10). Both offerors offered varying rationales to support the prices they proposed. (AR 9908–10, 9939–42).

After reviewing Indra's responses, the Air Force concluded that Indra had "provided sufficient rationale and support for all proposed CLIN prices more than 25% less than the IGE." (AR 13320). Based on the record before the Court, the Air Force followed the evaluation criteria stated in the RFP and utilized an authorized method of determining price realism. The Court also notes that while the RFP only required one method of analysis the Air Force utilized three, further suggesting an abundance of reasoned analysis. (AR 523). Because the Court has not found anything contrary to the Solicitation's stated criteria the Court declines to question further the Air Force's methodology.[7]

---

[5] FAR 15.404-1(b)(2) recognizes all three of the identified methods that the Air Force intended to use.

[6] The Air Force specified the 25% standard was simply to be a starting point for discussions and was not intended to serve as a "hard cutoff" in determining whether a CLIN was realistic in comparison with the IGE. (*See* AR 13320, 13348).

[7] Thales also argues that the differences in price and experience between Indra and Thales indicate that the Air Force failed to conduct a reasonable analysis. (Pl.'s MJAR at 34). Thales is essentially arguing that Indra's price cannot be realistic simply because Thales proposed a substantially higher price. This argument is unconvincing.

15

2.  *Price Discussions*

Thales argues that the Air Force engaged in unequal discussions between itself and the Indra. (Pl.'s MJAR at 34–36). Thales alleges that the Air Force instructed it to "increase dramatically its pricing in a number of areas[,]" including increased data rights, expanded spare parts, and value-added tax ("VAT") on shipments. (*Id.* at 34–35).

Discussions may be unequal when the procuring agency favors "one offeror over another[.]" FAR 15.306(e)(1). "Consequently, although contracting officers should tailor discussions to each offeror's proposal . . . they should not 'inform some offerors of a concern . . . while staying silent with respect to identical issues in other offerors' proposals[.]'" *Raytheon Co.*, 121 Fed. Cl. at 164–65 (internal citations omitted). Further, the FAR does not require notification to an offeror "that its acceptable approach is less advantageous than an approach proposed by another offeror." *Connected Glob. Sols., LLC v. United States*, 162 Fed. Cl. 720, 737 (2022) (citing FAR 15.306(d)(3)). The Court has already determined that Thales's approach to data rights was distinguishable from Indra's, therefore its claim of unequal treatment fails.

Thales's next argument, that the Air Force "only asked Thales to price an expanded list of spare parts," is factually incorrect. (Pl.'s MJAR at 34). The Air Force's initial request during the EN process was identical for both offerors regarding spare parts. (AR 9907, (EN to Indra), 9939, (EN to Thales)). The spare parts issue that Thales highlights was Indra's response to CLINs ▇▇▇ and ▇▇▇ in which Indra stated:



(AR 9908). Thales's response for CLINS 0005-6005 and 0006-6006 stated:



(AR 9940–41). The record demonstrates that Thales decided to revise its prices while Indra confirmed its prices; it was only after Thales revised its prices that the Air Force requested

additional information. (AR 9958–61). Different approaches by offerors in response to identical ENs provide no support for an argument of unequal discussions.

Thales argues that the Air Force engaged in unequal discussions because it failed to question Indra regarding its proposed pricing for VAT payments. (Pl.'s MJAR at 33). Thales highlights a symptom while ignoring the cause. Thales requested an exception to a requirement in the RFP which required the awardee to bear all shipping costs. (AR 10300). The Air Force found this request to be unacceptable, and thus issued Thales an EN. (*Id.*) Indra did not request any exceptions to bear the burden of shipping costs, and no EN was issued in this regard. (AR 18066). It does not follow that the Air Force should have questioned Indra's proposal because of Thales's decisions.

### C. Best Value Determination

Thales alleges that the Air Force conducted a flawed best value determination because "it determined erroneously that both offerors should be rated as low risk, and it failed to properly conduct a price realism analysis." (Pl.'s MJAR at 36). Thales bases this argument on the premise that Indra self-identified a ▮▮▮▮▮▮▮▮▮▮ and proposed an "unrealistic price." (*Id.* at 37). However, as explained above, the Court concludes that the Air Force's evaluation of Indra was consistent with stated evaluation criteria and therefore was neither arbitrary nor capricious. Neither does Thales demonstrate that the Air Force conducted a flawed best value determination. Further analysis of this argument is unnecessary.

### D. Source Selection Decision

Thales's final challenge alleges that the SSA "failed to exercise independent judgment" and erred in its best value decision. (Pl.'s MJAR at 38). Specifically, Thales asserts that the SSA relied entirely on the conclusions of the evaluation team and offered no independent rationale or assessment of the information presented, violating FAR 15.308. (*Id.*). Thales believes that if a proper assessment had been completed, the SSA would have taken issue with Indra's price, past performance, and ▮▮▮▮▮▮▮▮ issues. (*Id.*). The Court's reasoning differs from Thales's.

The FAR establishes that the source selection decision document ("SSDD") shall represent the independent judgment of the SSA. *See* FAR 15.308. However, an SSA is permitted to utilize the reports and analyses generated by others in reaching their final decision. *Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 245 (2011). Even further, the FAR "recognizes that the 'business judgments and tradeoffs' of others may be 'relied on by the SSA.'" *Id.* (citing *USfalcon, Inc.*, 92 Fed. Cl. at 453 ("nothing prevents the SSA from basing his judgment upon the evaluations and ratings of others")).

Here, the SSA was involved throughout the procurement. The AR demonstrates that the SSA received multiple briefings from the SSEB during which the SSAC and the SSA were able to ask specific questions about the procurement's progress. (AR 2752–2938, 10368–557, 13380–441). The SSA would later conduct her own "integrated assessment of the proposals" and present a record of her decision in an SSDD. (AR 13463–75). Within the SSDD, the SSA stated that she had received all available acquisition documents, including "[the] evaluation briefing slides, offerors proposals, technical subfactor evaluation worksheets, consensus documentation,

evaluation notices (ENs), evaluation reports, technical ratings, cost/price information, and other documentation." (AR 13463). The SSA affirmed that her "comprehensive review" consisted of reviewing the documentation and consulting with the SSAC, SSEB, and her advisors. (AR 13475). Finally, the SSA expressed that after reviewing and questioning the SSEB's findings she was "confident in their assessments." (AR 13475). More is not required.

Thales fails to identify anything in the record demonstrating the SSA failed to exercise independent judgment. Thales's insistence that the SSA should have found concern with Indra's pricing, past performance, or ▮▮▮▮▮▮▮▮ is simply continued disagreement with the SSA's judgment. *Ocean Ships, Inc. v United States*, 115 Fed. Cl. 577, 593 (2014). Thus, Thales's qualms with the SSA's independent evaluation are unwarranted.

### E.  Injunctive Relief

Injunctions are a "drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). To obtain permanent injunctive relief, a party must demonstrate: (1) success on the merits; (2) irreparable harm if an injunction does not issue; (3) the balance of harm favors the movant; and (4) that the injunction serves the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004); *Amazon Web Servs., Inc. v. United States*, 147 Fed. Cl. 146, 153 (2020). Although "[n]o one factor, taken individually, is necessarily dispositive . . . , the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

Thales claims that it will suffer irreparable harm due to being denied the opportunity to fairly compete in the bidding process due to the Air Force's errors. (Pl.'s MJAR at 39). However, because Thales has failed to establish success on the merits, there is no need for further analysis. Thales's request for a permanent injunction is denied.

### F.  Miscellaneous Filings

Thales filed two unsolicited Declarations from George Weida ("Mr. Weida"), who claims to be the Technical Director for Thales. (ECF No. 9; ECF No. 39-1). In response, Indra moved to strike both declarations and a reference to a URL link found in Thales's Reply Brief. (ECF No. 35; ECF No. 41). The United States also filed two declarations from Amanda Jones ("Ms. Jones"), the CO. (ECF No. 37-2; ECF No. 43-1). Neither party sought leave to complete or supplement the record.

The administrative record constitutes materials before the agency at the time of the decision. *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009). ("The purpose of limiting review to the record actually before the agency is to guard against courts using new evidence to 'convert the 'arbitrary and capricious' standard into effectively de novo review.'") (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000), *aff'd*, 398 F.3d 1342 (Fed. Cir. 2005)). Supplementation of the record should only occur when "the omission of extra-record evidence precludes effective judicial review." *Id.*

There are two methods by which parties may seek to submit additional information: a motion to complete and a motion to supplement. A motion to complete the record seeks to add omitted documents considered by the agency and relevant to the challenged decision. *See BHB Ltd. P'ship v. United States*, 147 Fed. Cl. 226, 229 (2020). Because the administrative record is presumptively complete, the Court requires "clear evidence of material that was generated or considered by the agency but excluded from the record[.]" *Id.* at 229 (internal citations omitted); *see also Linc Gov't Servs., LLC v. United States*, 95 Fed. Cl. 155, 158 (2010). On the other hand, a request to supplement the record may be granted if it is "necessary for effective judicial review or if the existing record cannot be trusted." *Diversified Maint. Sys. v. United States*, 93 Fed. Cl. 794, 802 (2010) (internal quotations omitted); *cf. Axiom Res. Mgmt.*, 564 F.3d at 1381. This is an extreme measure, to be exercised in limited circumstances, such as where the agency failed to consider relevant factors or where there is some evidence of bad faith or improper behavior by agency officials. *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 339, 342 (1997)). Only in instances where the Court can explain why the omitted evidence frustrated judicial review as to "whether [the agency action] was arbitrary and capricious[,]" may supplementation be proper. *AgustaWestland N. Am., Inc. v. United States*, 880 F.3d 1326, 1332 (Fed. Cir. 2018) (citing *Axiom Res. Mgmt.*, 564 F.3d at 1379–80). Here, supplementation was neither sought nor helpful. If anything, the effect of the parties' multiple filings resulted in unnecessary briefing and distraction from the central issues of this protest.

When questioned during oral argument, Thales stated that the first declaration of Mr. Weida, (First Weida Decl., ECF No. 9), was "solely to provide background on the exhaustive efforts to move from a fixed TACAN into a mobile TACAN." (OA Tr. 12:12–13, ECF No. 49). Later, Thales argued that this background information was "necessary for a full and complete understanding of the issues." (Pl.'s Opp. to First Mot. to Strike at 1, ECF No. 38). Nothing in Weida's first declaration was necessary for effective review. Indra's motion to strike Mr. Weida's first declaration, (Int-Def.'s First Mot. to Strike, ECF No. 35), is **GRANTED**.

Weida's second declaration, (Second Jones Decl., ECF No. 39-1), was provided to respond to the CO's declarations filed by the United States, (OA Tr. 12:23–25); therefore, the Court first reviews the United States' declarations. Both of the CO's declarations, (*See* First Jones Decl., ECF No. 37-2; Second Jones Decl., ECF No. 43-1), were ostensibly directed at the relevant harm prongs of Thales's motion for injunctive relief. (OA Tr. 15:1–11). While potentially proper, the CO's declarations were not constructive. Declarations are most useful and probative when submitted by a person with personal knowledge. While COs presumably possess a great deal of expertise about the particulars of a procurement, that knowledge is unlikely to extend to the expertise of highly technical equipment or, as here, knowledge regarding the impact on combat readiness of portable air navigation systems. Here, the CO candidly disclosed her reliance on information relayed to her by third-parties unknown to the Court, regarding the effect of delay caused by issuance of a permanent injunction. (*See* First Jones Decl., at 1; Second Jones Decl., at 1; *see also* OA Tr. 15:12–17:9). A contracting official's opinion, without demonstrating such expertise, on such technical matters has little probative value. In light of the Court's holdings above, this issue is moot. Consequently, Thales's second Weida declaration is also moot.

Finally, Indra filed a second motion to strike pertaining to the second Weida declaration and a URL webpage found in Thales's Reply brief. (Int-Def.'s Second Mot. to Strike, ECF No.

41). The Court has determined the issue of Thales second declaration to be moot, additionally, the Court did not consider the URL webpage in this ruling, therefore Indra's motion to strike is **DENIED AS MOOT.**

### III.     Conclusion

For the reasons stated above, Thales's Motion for Judgment on the Administrative Record, (Pl.'s MJAR, ECF No. 34), is **DENIED**. The United States' and Indra's Cross-Motions for Judgment on the Administrative Record, (Def.'s xMJAR, ECF No. 37; Int-Def.'s xMJAR, ECF No. 36), are **GRANTED**.

Indra's Motion to Strike, (ECF No. 35), is **GRANTED**. The Clerk is **ORDERED** to **STRIKE** Declaration of George Weida, (ECF No. 9). Indra's Motion to Strike, (ECF No. 41), is **DENIED** as **MOOT.**

The Clerk is **DIRECTED** to enter judgment accordingly. The parties shall meet and confer and file a Joint Status Report proposing redactions to this memorandum opinion by **February 21, 2025**, to allow the Court to file a public version of the opinion.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge